**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 18-34658** |
| **HOUTEX BUILDERS, LLC,** *et al.*,[1] | § | |
| | § | **CHAPTER 11** |
| **DEBTORS.** | § | |
| | § | |
| | § | |

**AMENDED DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION**
**OF HOUTEX BUILDERS, LLC, 2203 LOOSCAN LANE, LLC, AND**
**415 SHADYWOOD, LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  This proposed Disclosure Statement is not a solicitation of acceptance or rejection of the Plan. Acceptances or rejections may not be solicited until the Bankruptcy Court has approved this Disclosure Statement under Bankruptcy Code § 1125. This proposed Disclosure Statement is being submitted for approval only, and has not yet been approved by the Bankruptcy Court.

---

[1]     The names of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: HOUTEX Builders, LLC (2111); 2203 Looscan Lane, LLC (1418); and 415 Shadywood, LLC (7627).

# TABLE OF CONTENTS

ARTICLE I DESCRIPTION OF THE PLAN'S TREATMENT OF CLAIMS. ....................2

    A.    Administrative and Priority Claims. ..................................................................2
    B.    Holders of Claims Entitled to Vote. ................................................................4
    C.    Acceptance of a Plan by a Class. .....................................................................5
    D.    Summary of Classification and Treatment of Claims. .....................................6
    E.    Plan Support Agreement with Great Southwest Financial Corporation. .........8
    F.    Special Provision Governing Unimpaired Claims. ..........................................8
    G.    Nonconsensual Confirmation. ..........................................................................8

ARTICLE II OVERVIEW OF THE DEBTORS' BUSINESSES AND CLAIMS AGAINST
HL BUILDERS, LLC F/K/A CD HOMES .........................................................................9

    A.    Debtors Generally. ...........................................................................................9
    B.    Robert Parker and HL Builders, LLC f/k/a CD Homes, LLC. ........................9
    C.    CD Homes's Mismanagement and Fraud. .......................................................9
    D.    Lead-Up to Bankruptcy. .................................................................................11
    E.    Claims Against CD Homes. ...........................................................................11

ARTICLE III SIGNIFICANT EVENTS IN THE DEBTORS' CASE ..............................12

    A.    Financial Condition of Houtex. ......................................................................12
    B.    Financial Condition of Shadywood. ...............................................................13
    C.    Financial Condition of Looscan. ....................................................................13
    D.    Debtor-in-Possession Financing. ...................................................................13
    E.    Sale of Properties. ..........................................................................................13
    F.    Employment of Professionals. ........................................................................14

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ................................14

    A.    Sale and Distribution of Non-Remnant Assets. .............................................14
    B.    Preservation of Causes of Action ...................................................................14
    C.    Remnant Asset Auctions. ...............................................................................14
    D.    Establishment of Houtex Liquidating Trust and Authority, Rights and Duties
           of Liquidating Trustee. ...................................................................................15
    E.    Claims Entitled to Distribution from the Houtex Liquidating Trust. .............16
    F.    Operations of the Debtors Between Confirmation Date and Effective Date ...18
    G.    Establishment of the Administrative Claims Bar Date. ..................................18
    H.    Term of Injunctions or Stays. .........................................................................18
    I.    Debtors' Professionals. ...................................................................................18
    J.    Closure of Looscan and Shadywood Cases. ...................................................19

ARTICLE V PROVISIONS GOVERNING DISTRIBUTIONS ......................................19

    A.    Initial Distributions from Remnant Asset Proceeds ......................................19
    B.    Initial Distributions from Houtex Liquidating Trust ......................................19
    C.    Subsequent Distributions. ...............................................................................19
    D.    Delivery of Distributions. ...............................................................................19
    E.    Manner of Cash Payments Under the Plan. ....................................................20
    F.    Time-Bar to Cash Payments by Check. ..........................................................20
    G.    Compliance with Tax Requirements. ..............................................................20

H.    No Payments of Fractional Dollars and Minimum Distributions. ................21
I.    Interest on Claims. ........................................................................................21
J.    No Distribution in Excess of Allowed Amount of Claim. ...........................21
K.    Setoff and Recoupment...............................................................................21
L.    No Distribution Pending Allowance. ..........................................................21

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ...............................................................................................................22

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ...22
B.    Claims Based on Rejection of Executory Contracts and Unexpired Leases. ..22

ARTICLE VII CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .................22

ARTICLE VIII INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED
PROVISIONS .......................................................................................................23

A.    Compromise and Settlement..........................................................................23
B.    Releases. .........................................................................................................23
C.    Exculpation. ....................................................................................................24
D.    Injunction. .......................................................................................................24
E.    Release of Liens. .............................................................................................25
F.    Carve-Out .......................................................................................................25

ARTICLE IX RETENTION OF JURISDICTION ...................................................25

ARTICLE X SOLICITATION AND VOTING PROCEDURES.................................26

A.    Holders of Claims Entitled to Vote on the Plan............................................27
B.    Voting Record Date. .......................................................................................27
C.    Submitting Votes on the Plan. .......................................................................27
D.    Which Ballots Are Not Counted. ..................................................................28

ARTICLE XI CONFIRMATION OF THE PLAN....................................................28

A.    Requirements for Confirmation of the Plan. ................................................28
B.    Best Interests of Creditors/Liquidation Analysis. ........................................28
C.    Feasibility. ......................................................................................................29
D.    Acceptance by Impaired Classes. ..................................................................29
E.    Confirmation Without Acceptance by All Impaired Classes. ......................29

ARTICLE XII TAX CONSEQUENCES OF THE PLAN ...........................................31

ARTICLE XIII CONCLUSION AND RECOMMENDATION...................................31

Houtex Builders, LLC ("Houtex"), 2203 Looscan Lane, LLC ("Looscan") and 415 Shadywood, LLC ("Shadywood" and collectively with Houtex and Looscan, the "Debtors") submit this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with: (1) the solicitation of acceptances of the Plan that the Debtors filed with the Bankruptcy Court; and (2) the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), scheduled to commence on [●],[2] 2019 at [●].m. (prevailing Central Time).  **Unless otherwise indicated or defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Joint Plan of Liquidation of Houtex Builders, LLC, 2203 Looscan Lane, LLC, And 415 Shadywood, LLC  Under Chapter 11 of the Bankruptcy Code (the "Plan") filed in connection herewith.**

In addition, unless otherwise noted, a ballot for the acceptance or rejection of the Plan is enclosed with each copy of this Disclosure Statement that is submitted to the holders of Claims that are entitled to vote to accept or reject the Plan.

On **[●]**, 2019, after notice and a hearing, the Bankruptcy Court entered an order (the "Disclosure Statement Order") [ECF No. [●]] approving this Disclosure Statement as containing adequate information of a kind, and in sufficient detail, to enable hypothetical, reasonable persons typical of the Debtors' creditors to make an informed judgment regarding the Plan.  Further, the Court deemed this Disclosure Statement approved for the purposes of soliciting votes on the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures, and instructions for filing objections to confirmation of the Plan.  Detailed instructions for voting to accept or reject the Plan accompany each ballot.

Before voting on the Plan, each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, any supplement to the Plan, any exhibits attached to all of the foregoing documents, the agreements and documents described therein, the Disclosure Statement Order, and the instructions accompanying the ballot in their entirety.  These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes.

**Chapter 11.**

Chapter 11, the principal business reorganization chapter of the Bankruptcy Code, permits a debtor to reorganize or liquidate its business for the benefit of itself and its creditors.  The commencement of a Chapter 11 Case creates an estate comprised of all of the legal and equitable interests of the debtor as of the date the chapter 11 petition is filed.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

---

[2]       The bracketed circles represent information that will be filled in prior to the solicitation of the Plan and Disclosure Statement.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against a debtor. Confirmation of a plan by the Bankruptcy Court binds the debtor, any person acquiring property under the plan, any creditor or ownership interest holder of a debtor, and any other person or entity subject to the terms and conditions of the plan. Subject to certain limited exceptions, the order approving confirmation of a plan of reorganization discharges a debtor from any debt, ownership interest, or other claim that arose prior to the date of confirmation of the plan and substitutes in place of such debts and other claims the obligations specified in the confirmed plan.

Certain holders of claims against the Debtors are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, § 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable claimant to make an informed judgment regarding the plan. The Debtors are submitting this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code to holders of Claims against the Debtors that are entitled to vote to accept or reject the Plan.

**Plan Summary.**

The Plan contemplates a liquidation of the Debtors by: (1) paying Spirit of Texas Bank the remaining Thornblade Sale Proceeds; (2) selling the Lynbrook House and satisfying the CommunityBank Secured Claim and using the remaining proceeds as specified in the Plan; (3) auctioning the Shadywood Remnant Assets and the Looscan Remnant Assets, at which the holder of the Shadywood DIP Facility Claim and the Looscan DIP Facility Claim will make a non-cash bid for the Shadywood Remnant Assets and the Looscan Remnant Assets, respectively; (4) transferring the Houtex Remnant Assets to a Liquidating Trust to be managed for the benefit of the Houtex creditors..

## ARTICLE I
## DESCRIPTION OF THE PLAN'S TREATMENT OF CLAIMS.

**A.     Administrative and Priority Claims.**

> 1.   Non-DIP Administrative Claims.

The treatment of the Non-DIP Administrative Claims is specified in the Plan. The Debtor's expect that the only Non-DIP Administrative Claims that will remain on the Effective Date are unpaid Professional Fees. Such unpaid Professional Fees shall be satisfied from the proceeds of the sale of Lynbrook. Professional Compensation is discussed in more detail below.

> 2.   DIP Facility Claims.

The Houtex DIP Facility Claim will be satisfied in full from the proceeds of the sale of Lynbrook.

The Shadywood DIP Facility Claim and the Looscan DIP Facility Claim shall be satisfied in the following manner:

2

1.    The DIP Lender shall submit a non-cash bid in the full unpaid amount of the Shadywood DIP Facility Claim and the Looscan DIP Facility Claim at each of the Auctions for the sale of the Shadyoowd Remnant Assets and the Looscan Remnant Assets, respectively.

2.    If the DIP Lender is declared the Successful Bidder at an Auction, the DIP Lender's DIP Facility Claims against such Debtor shall be deemed satisfied in full upon the closing of the sale of such Debtor's Remnant Assets to the DIP Lender.  For avoidance of doubt, pursuant to the terms of this Plan, there will be no Auction of the Houtex Remnant Assets; rather the Houtex Remnant Assets shall be assigned to the Houtex Liquidating Trust.

3.    If the DIP Lender is not the Successful Bidder at an Auction, the DIP Lender shall be paid in full and final satisfaction, settlement and discharge of, and in exchange for the DIP Facility Claim against from such Debtor's Remnant Asset Sale Proceeds.

   3.    Professional Compensation and Reimbursement Claims and the Professional Fee Reserve.

During January 2019, the principal asset of Shadywood and Looscan were sold.  As a result, all Professional services incurred after February 1, 2019 are principally benefiting Houtex and shall be asserted exclusively against Houtex and not Shadywood or Looscan.

All Professionals employed by the Debtors in the Chapter 11 Cases will (i) provide to Houtex within seven (7) days after the Confirmation Date, an estimate of their Accrued Professional Compensation through the Effective Date, and (ii) file all requests for allowance of compensation and reimbursement of expenses pursuant to §§ 328, 330 or 503(b) of the Bankruptcy Code for services performed and expenses incurred in the Chapter 11 Cases through the Effective Date by no later than the Professional Fee Claim Bar Date.

On the Effective Date, Houtex or the Liquidating Trustee, as the case may be, shall establish and fund the Professional Fee Reserve in accordance with the estimates provided by the Professionals in accordance with the preceding paragraph.

If excess amounts remain in the Professional Fee Reserve after all Allowed Claims of Professionals have been paid in full, such excess amounts shall distributed to holders of Allowed Houtex General Unsecurd Claim in accordance with the provisions of this Plan or the Liquidating Trust Agreement.

   4.    Priority Claims.

The Debtors do not believe there are any valid Priority Claims.

If there are any Allowed Priority Claims against Houtex, the Liquidating Trustee shall pay each holder of an Allowed Priority Claim against Houtex the full unpaid amount of such Allowed Priority Claim in Cash, on the later of: (i) seven (7) days after the Effective Date; (ii) seven (7) days after the date such Priority Claim becomes Allowed; and (iii) the date such Allowed Priority Claim is payable under applicable non-bankruptcy law.

If there are any Allowed Priority Claims against Shadywood or Looscan, then the holders of such Allowed Priority Claims against Shadywood and Looscan shall be paid from the excess proceeds

of the sale of the Shadywood Remnant Assets or the Looscan Remnant Assets, respectively, if there are such excess proceeds. If there are no such excess proceeds then the holds of any Allowed Priority Claims against Shadywood and the holders of Allowed Priority Claims against Looscan shall receive nothing on account of their claims.

**B.      Holders of Claims Entitled to Vote.**

Under the Bankruptcy Code, only holders of allowed claims in impaired classes of claims that are not deemed to have accepted or rejected a proposed plan are entitled to vote to accept or reject a proposed chapter 11 plan.

A class is "impaired" under a plan unless, with respect to each claim or interest of such class, the plan:

- leaves unaltered the legal, equitable or contractual rights to which the holder of the claim or interest is entitled; or

- notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based on such claim or interest.

Classes of claims that are unimpaired under a chapter 11 plan are conclusively presumed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims in which the holders will receive no recovery under a chapter 11 plan are deemed to have rejected the plan and are also not entitled to vote to accept or reject the plan.

1.   **Classes of Claims are Entitled to Vote on the Plan.**

Holders of Claims in the following Classes are impaired and entitled to vote on the Plan:

- Shadywood DIP Facility Claim

- Looscan DIP Facility Claim

- Spirit of Texas Bank

- Great Southwest Financial Corporation

- Houtex General Unsecured Claims

- Shadywood General Unsecured Claims

- Looscan General Unsecured Claims

4

2.  **Classes of Claims That Are Unimpaired and Not Entitled to Vote on the Plan.**

Holders of classes of claims that are unimpaired under the Plan are deemed to accept the Plan and are not entitled to vote on the Plan. Holders of Claims in the following Classes are unimpaired and not entitled to vote on the Plan:

- Priority Claims

- Houtex DIP Facility Claim

- CommunityBank

- Other Secured Claims

3.  **Classes of Claims and Interests That Receive No Property Under the Plan That Are Deemed to Reject The Plan and Not Entitled to Vote on the Plan.**

Holders of classes of claims and interests that receive no property under the Plan are deemed to reject the Plan and are not entitled to vote on the Plan.  Holders of Claims and Interests in the following Classes are receiving no property under the Plan, are deemed to reject the Plan and are not entitled to vote on the Plan:

- Houtex Member Interests

- Shadywood Member Interests

- Looscan Member Interests

**C.   Acceptance of a Plan by a Class.**

The Bankruptcy Code defines "acceptance" of a plan by a class of impaired Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  In the event that the Bankruptcy Court enters an order holding that any Class of Claims is unimpaired, each holder of an Allowed Claim in any such Class will be conclusively presumed to have accepted the Plan, and any votes to accept or reject the Plan submitted by holders of Claims in any such Class will be null, void, and have no effect.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan, request confirmation of the Plan under § 1129(b) of the Bankruptcy Code, or both. Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of a plan by one or more impaired classes of claims through a procedure known as "cram-down."

Under § 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. If a Class of Claims entitled to vote does not vote to accept the Plan, the Debtors will announce its determination on whether to request confirmation of the Plan under § 1129(b) of the Bankruptcy Code prior to or at the Confirmation Hearing.

**D.      Summary of Classification and Treatment of Claims.**

In accordance with § 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims or Priority Claims.

The following table classifies Claims against the Debtors collectively, for all purposes, including voting, confirmation, and distribution pursuant to the provisions of the Plan and pursuant to §§ 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim to be classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that such Claim or any portion thereof qualifies within the description of such different Class. A Claim is in a particular Class only to the extent that any such Claim is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated under the Plan as a distinct Class for voting and distribution purposes.

| Proposed Treatment of Classes of Creditors Under the Plan | | |
|---|---|---|
| **Description of Class** | **Estimated Range of Claims in Class** | **Proposed Treatment Under Plan** |
| **UNCLASSIFIED CLAIMS** | | |
| Non-DIP Administrative Claims | $75,000[3] | Paid in full |
| Priority Claims | $0.00 | Paid in full |
| **DIP Facility Claims** | | |
| Houtex DIP Facility Claim | $125,000 to $164,583 | Paid in full from sale of Lynbrook. |
| Shadywood DIP Facility Claim | $60,000 to $120,788 | Will be used as a credit in Auction of Remnant Assets. |
| Looscan DIP Facility Claim | $60,000 to $116,524 | Will be used as a credit in Auction of Remnant Assets. |
| **SECURED CLAIMS** | | |
| CommunityBank | $1,627,070.69[4] | Paid in full |

---

[3]     The Debtors do not anticipate having any unpaid administrative claims on the effective date other than professional fees that have not already been satisfied from proceeds of the DIP Facilities. Therefore, this is the estimated amount of unpaid Professionals on the Effective Date.

[4]     Amount assumes a payoff by July 31, 2019.

|  |  |  |
|---|---|---|
| Spirit of Texas Bank | $1,725,759.95 | The holder of the Spirit of Texas Bank shall receive the following: (i) no later than fifteen (15) days after the Effective Date, all of the remaining proceeds of the sale of Thornblade plus the certificate of deposit at Spirit of Texas in the amount of $252,000.00, (ii) no later than seven (7) days after the liquidation of the Nored Note, the proceeds of the Nored Note, and (iii) a Houtex General Unsecured Claim for any portion of the Spirit of Texas Bank Secured Claim that is not satisfied by (i) and (ii) (the "Spirit of Texas Bank Deficiency Claim"). At any time, Spirit of Texas Bank may waive its entitlement to the proceeds of the Nored Note by sending written notification of such waiver to Houtex or the Liquidating Trustee and in such case the Nored Note will be liquidated for the benefit of all the Houtex General Unsecured Creditors and the Spirit of Texas Bank Deficiency Claim will be determined by just taking into account the distribution of property in (i) above. |
| Great Southwest Financial Corporation | $387,254.71 | The holder of the Great Southwest Financial Corporation Claim shall receive a Houtex General Unsecured Claim in the amount of $387,254.71 plus an allocation of the proceeds of the Foster Claim as provided in the Plan Support Agreement. |
| Other Secured Claims | Property taxes for the Lynbrook house (estimated in the maximum amount of $210,000 on the Effective Date)<br><br>Homeowners' association fees (estimated in the maximum amount of $2,000 on the Effective Date) | Any creditor holding an Other Secured Claim that is not expressly otherwise provided for herein shall receive the following: (a) if the value of the collateral securing the Other Secured Claim is equal to or greater than the Allowed amount of such Other Secured Claim then the holder of such Other Secured Claim shall receive the following: (i) the property securing the Other Secured Claim and (ii) a Deficiency Claim for the amount equal to the amount of the Allowed Other Secured Claim less the value of such collateral against the appropriate Debtor, and (b) if the value if the collateral is greater than the amount of |

| | | the Allowed Other Secured Claim, then the holder of such Other Secured Claim shall receive the indubitable equivalent of such claim as determined by the Debtors which can include the cash value of the claim upon liquidation of the collateral (i.e., the Lynbrook house). |
|---|---|---|
| **UNSECURED CLAIMS** | | |
| Houtex General Unsecured Claims | $5,000,000 to $7,000,000 | Paid pro rata through recoveries by Liquidating Trust. |
| Shadywood General Unsecured Claims | $700,000 to $1,400,000 | Paid pro rata based on results of auction. |
| Looscan General Unsecured Claims | $950,000 to $1,100,00 | Paid pro rata based on results of auction. |
| **UNSECURED CLAIMS** | | |
| Houtex Member Interests | N/A | Extinguished |
| Shadywood Member Interests | N/A | Extinguished |
| Looscan Member Interests | N/A | Extinguished |

**E.      Plan Support Agreement with Great Southwest Financial Corporation.**

In order to resolve an informal objection raised by Great Southwest Financial Corporation in connection with the Plan, the Debtors and Charles Foster entered into a Plan Support Agreement with Great Southwest Financial Corporation.  A copy of the Plan Support Agreement is attached hereto as Exhibit A.  The Plan Support Agreement provides for, among other things, an allocation of a percentage of the recovery on the Foster claim to Great Southwest Financial Corporation.

**F.      Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights with respect to any Unimpaired Claim, including, without limitation, any legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**G.      Nonconsensual Confirmation.**

The Debtors reserve the right to seek confirmation of the Plan under § 1129(b) of the Bankruptcy Code.  To the extent that any Class votes to reject the Plan, the Debtors further reserves the right to modify the Plan.

ARTICLE II
OVERVIEW OF THE DEBTORS' BUSINESSES
AND CLAIMS AGAINST HL BUILDERS, LLC F/K/A CD HOMES

**A.      Debtors Generally.**

The Debtors were in the business of building high-end, single-family homes in the Houston area.  2203 Looscan Lane, LLC and 415 Shadywood, LLC were single-purpose entities formed to finance the construction of homes at their respective addresses.  Houtex Builders, LLC, on the other hand, was formed to finance the construction of several homes, including ones located at 3 Thornblade, 15 Thornblade, 5325 Lynbrook, 3019 Ella Lee, 3054 Locke Lane, and 6111 Crab Orchard.

The Debtors are each owned 100% by Charles C. Foster and Lily Foster (the "Fosters").

**B.      Robert Parker and HL Builders, LLC f/k/a CD Homes, LLC.**

The Fosters and Robert Parker have had a business relationship spanning approximately ten years. Over the course of this time, Parker, through HL Builders, LLC ("CD Homes"), has constructed custom built homes that the Fosters have financed by providing capital and guaranteeing construction loans. As a general rule, Parker was charged with the responsibility of managing the project, including purchasing the property, securing appropriating financing for the project, construction of the home, and managing the sale process.

Foster met with Parker periodically in order to discuss the progress of the various projects. Parker would often provide sales and marketing information regarding the properties that ultimately turned out to be extremely over optimistic. Parker would also regularly provided Charles Foster with financing documents for execution on the various properties. Originally, these documents generally consisted of construction loans and accompanying guarantees. As time progressed, Parker began the practice of presenting Charles Foster with documents for lines of credit for the properties "just in case."

During the relationship, the Fosters discovered that they were able to borrow money at a rate lower than those from traditional construction loans through their own banking relationships. The Fosters presented this information to Parker with the idea that the reduced interest would decrease the carrying costs of the homes, thereby decreasing the overall risk of the projects. Parker agreed, and the Fosters began utilizing these personal lines to provide equity infusions for the entities to use in developing the properties.

**C.      CD Homes's Mismanagement and Fraud.**

The Fosters became concerned upon the sale of a property located at 5305 Green Tree, Houston, Texas ("Green Tree") in February of 2016. The Fosters financed the home by borrowing money personally to provide equity infusions for the entity. The Fosters estimated that they would receive approximately $2 million from the sale, which would thereby provide them with the ability to retire the loans and achieve a profit distribution. To their dismay, this did not occur.

When questioning Parker about the proceeds from the sale, Parker explained that he needed the funds the Fosters originally provided for use in the other developments. Foster further learned

that Parker had been financing the construction of Green Tree through hard money loans. Given that the loans on Green Tree carried a 15% interest rate, the proceeds that Foster anticipated based on his 2% rate on his personal line had quickly evaporated.

When Charles Foster raised concerns about the lending on Green Tree, Parker told him not to worry, and that the Fosters would get their money back through the sale of a property located at 5428 Longmont, Houston, Texas ("Longmont"). Of course, when Longmont was sold in January of 2017, the story was the same. Parker again stated that the money the Fosters personally borrowed was used on other properties, and Longmont needed a hard money loan to complete construction.

At this point, the Fosters were left in a position of not knowing where their money had gone. Mr. Parker and CD Homes have never provided an accounting of these funds.

The sale of 5341 Cedar Creek Dr., Houston, TX 77056 ("Cedar Creek") raised further concerns for the Fosters. At the closing of Cedar Creek in January 2018, Charles Foster was informed there was a new lien filed against the property that had not shown up on the earlier title report and had been placed on the property just before the scheduled closing. The Fosters learned that new lien had been placed on the property by Parker as manager of entity that owned the property and was made for the benefit of Hampton Lane Builders, LLC, another entity owned by Parker. Because the title company would not close the transaction without satisfying these liens, the Fosters authorized this newly discovered lien to be paid at the closing of Cedar Creek.

After the closing, the Fosters learned that the Hampton Lane Builders, LLC lien had been backdated.  The purported date of the instrument was March 31, 2014.  However, the notary stamp of Anna Williams on the instrument reflects an expiration date of November 29, 2018.  Because notary stamps are only valid for four years in Texas, the specific notary stamp could not have existed on March 31, 2014 as this would meant this specific notary stamp would have had an expiration date of longer than four years.

In January 2018, the relationship between the Fosters and Parker changed drastically when Parker started asking Charles Foster to loan him money. Parker's requests for loans started becoming more frequent and urgent. The Fosters started taking a more hands-on role monitoring the invoices related to the construction of the Properties.

Further, instead of tapping into its own funds for any payments that exceeded the sum of the construction loans and the Equity Loans, as required by the terms of the Investor Agreement (discussed in more detail below) CD Homes caused the Debtors to borrow millions of dollars from third-party "investors."  CD Homes also "rolled forward" unpaid debts from one project to another. In other words, instead of paying off all lienholders once a house sold, CD Homes agreed to encumber another project.

Despite obtaining additional funding from various sources, CD Homes failed to complete the Properties on time.

Throughout this time of Parker's and CD Homes's business dealings with the Fosters, CD Homes made millions of dollars in member draws to its nominal owner, Anna Williams, who is Mr. Parker's wife.

10

**D.       Lead-Up to Bankruptcy.**

In early 2018, Mr. Foster began to suspect that CD Homes and Mr. Parker had mismanaged the Debtors and their construction projects. Mr. Foster removed Mr. Parker's management responsibilities and sought information from CD Homes and Mr. Parker about the Debtors' finances. That information was not provided. Eventually, Mr. Foster discovered that the Debtors' were heavily indebted to previously undisclosed third-party lenders.

**E.       Claims Against CD Homes.**

The Debtors and CD Homes are parties to certain Investor Agreements related to each of the Properties.  The Investor Agreements establish how the Properties are to be funded and how the proceeds will be distributed.

With respect to funding, the Investor Agreements provide in relevant part:

> [Debtor] and [CD Homes] agree that if funds are required to make any payments that exceed the sun of the Investor's equity, as defined below, and the [Construction] Loan, all such funds are to be provided by [CD Homes].

Investor Agreements, Paragraph 6.  Accordingly, the Investor Agreements all provide that any funds required by the Properties over the Construction Loan and the Equity Loan (as defined in the Investor Agreements) are to be provided by CD Homes.

CD Homes has breached Section 6 of the Investor Agreements with each of the Debtors. Specifically, when the Properties required additional funds in excess of the Construction Loan and the Equity Loan, rather than funding the shortfall, CD Homes and Mr. Parker obtained third-party loans and used those loan proceeds to fund the additional costs of the Properties.

CD Homes and Bob Parker caused Houtex to enter into loan with Spirit of Texas Bank in the amount of $1.6 million (the "$1.6 Million SOTB Note").  According to a Sources and Uses chart prepared by CD Homes and Bob Parker attached hereto as Exhibit B, CD Homes and Bob Parker caused the Debtors to use proceeds from the $1.6 Million SOTB Note to fund required expenses for the Properties in the aggregate amounts as follows:

> 6111 Crab Orchard (owned by Houtex Builders): $535,596.50
>
> 3 Thornblade (owned by Houtex Builders): $467,635.43
>
> 2203 Looscan (owed by Looscan): $20,000
>
> 415 Shadywood (owned by Shadywood): $406,323.41

The Debtors had no obligation to obtain the $1.6 Million SOTB Note to fund such costs; instead CD Homes is required to fund all of these costs pursuant to the terms of the Investor Agreement.  CD Homes must reimburse the Debtor for these breaches of the Investor Agreements.

Bob Parker and CD Homes also caused Houtex to enter into a $500,000 line of credit from Spirit of Texas Bank (the "SOTB LOC") which had $483,754.90 outstanding principal and interest as

of the Petition Date, and a $387,254.71 loan from Great Southwest Financial Corp. Although the Debtors have not yet determined the exact use of these funds (because CD Homes has refused to timely comply with discovery requests), there are only two possible scenarios for how the funds were used. Either the funds were used in connection with the Properties, in which case, this is a breach of the Investor Agreements since CD Homes is required to provide such extra funds, not Houtex. Alternatively, the funds were not used in connection with any of the Properties which would mean that CD Homes stole the money and diverted it elsewhere. If this is the case, then Houtex has a conversion claim against CD Homes. Either way, Houtex has a claim against CD Homes for $871,000.61 – the aggregate amount owed on the SOTB LOC and the Southwest Financial Corp. claim.

The Debtors have valid liquidated claims against CD Homes for breaching the Investor Agreement and possibly conversion in the following amounts:

Houtex: $1,874,232.54

Looscan: $20,000

Shadywood: $406,323.41

The Debtors are continuing to investigate additional potential claims against CD Homes and Mr. Parker.

## ARTICLE III
## SIGNIFICANT EVENTS IN THE DEBTORS' CASE

The Debtors filed for bankruptcy on August 23, 2018 (the "Petition Date"). While in bankruptcy, the Debtors are operating their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

### A.      Financial Condition of Houtex.

Houtex filed its bankruptcy schedules and State of Financial Affairs on September 7, 2018 [ECF No. 38]. As of the Petition Date, Houtex's two main assets were 3 Thornblade Circle, Spring TX 77389, valued at $2,275,000, and 5325 Lynbrook Dr., Houston, TX 77056, valued at $2,800,000.

Both 3 Thornblade and 5325 Lynbrook Drive were encumbered by secured promissory notes. As of the Petition Date, Communitybank of Texas had a lien in the amount of approximately $1,560,332 on Lynbrook. On 3 Thornblade, Great Southwest Financial Corporation claimed liens in the amount of approximately $350,000, while Spirit of Texas Bank claimed a lien in the amount of $2,153,822.

Houtex is also the payee on a $1,600,000 promissory note from an individual named Jim D. Nored. However, based on a deposition of Mr. Nored and Mr. Parker, Mr Nored and Mr. Parker contend that no amounts were funded under such note.

Houtex scheduled $593,843.04 in unsecured claims, $107,850.00 of which Houtex contends is unliquidated.

**B.      Financial Condition of Shadywood.**

415 Shadywood, LLC filed its bankruptcy schedules and State of Financial Affairs on September 7, 2018 [ECF No. 39]. As of the Petition Date, 415 Shadywood's main asset was 415 Shadywood Road, Houston, TX 77057, valued at $3,217,500.   The Shadywood property was encumbered by a lien securing the repayment of a promissory note in the amount of $3,173,181 owed to Independent Bank.

415 Shadywood scheduled $653,748.99 in unsecured claims, $405,000.00 of which is disputed and $67,717.00 of which 415 Shadywood contends is unliquidated.

**C.      Financial Condition of Looscan.**

2203 Looscan Lane, LLC filed its bankruptcy schedules and State of Financial Affairs on September 7, 2018 [ECF No. 40]. As of the Petition Date, 2203 Looscan Lane's main asset was 2203 Looscan Lane, Houston, TX 77019, valued at $2,778,750.00. The Looscan property was encumbered by a lien securing the repayment of a promissory note in the amount of $2,643,895.00 owed to CommunityBank of Texas.

In addition, a creditor named Hmaidan & Hmaidan, LLC claimed to have a junior lien on the Looscan Property in the amount of $783,000.00. However, 2203 Looscan Lane disputed the validity of Hmaidan's debt.

2203 Looscan Lane scheduled $426,213.57 in unsecured claims, $57,011.00 of which 2203 Loscan Lane contends is unliquidated.

**D.      Debtor-in-Possession Financing.**

On the Petition Date, the Debtors filed an emergency motion seeking authorization to obtain debtor-in-possession financing from Charles Foster. Mr. Foster agreed to lend $186,000 to the Debtors at 3% interest to allow them to pay for maintenance of their properties and the costs of the Debtors' professionals.  Mr. Foster's loan was secured by junior liens on the Debtors' Properties.

The Court issued an Interim Order Authorizing the Debtors to Obtain Credit on September 7, 2018 [ECF No. 36].  The Court issued a Final Order Authorizing Debtors to Obtain Credit on September 27, 2018 [ECF No. 70].

The Debtors filed a second emergency motion to obtain debtor-in-possession financing on November 14, 2018 [ECF No. 134].  The second motion sought to increase the amount of borrowing to account for continued expenses during the Debtors' Chapter 11 case.  The Court issued an Interim Order granting the second motion on November 19, 2018 [ECF No. 144].  On December 5, 2018, the Court issued its final order authorizing the Debtors to borrow up to $428,154.00 from Mr. Foster.

**E.      Sale of Properties.**

On November 26, 2018, the Court approved Houtex's request to sell its property located at 3 Thornblade Circle, The Woodlands, Texas 77389 [ECF No. 158].

On December 17, 2018, the Court approved 415 Shadywood and 2203 Looscan Lane's

properties. [ECF Nos. 197 & 198].

Houtex's Lynbrook property has not yet sold.

**F.     Employment of Professionals.**

The Debtors are represented by Diamond McCarthy LLP and its attorneys Charles M. Rubio and Michael D. Fritz.  The Court granted the Debtors' application to employ Diamond McCarthy LLP on October 12, 2018.

The Debtors have also employed Martha Turner Sotheby's International Realty as their Real Estate Broker.  The Court approved Martha Turner's employment on October 17, 2018 [ECF No. 112].

Finally, the Debtors have employed Schmuck, Smith, Tees & Company PC as their accountants.  The Court approved Schmuck's retention on December 19, 2018 [ECF No. 201].

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.     Sale and Distribution of Non-Remnant Assets.**

1.     *Thornblade Sale Proceeds.*  Before the Effective Date, Houtex shall pay Spirit of Texas Bank the remaining Thornblade Sale Proceeds.

2.     *Lynbrook House.*  After the Confirmation Date, Houtex shall continue its efforts to sell the Lynbrook House.  As a condition precedent to the Effective Date of the Plan, Houtex shall have sold the Lynbrook House.

3.     *Certificate of Deposit.*  Houtex holds a Certificate of Deposit in the amount of approximately $250,000, which shall be used to pay Allowed Administrative Claims and otherwise distributed pro rata to creditors of Houtex.

**B.     Preservation of Causes of Action**

Unless any Causes of Action against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, settled, assigned, and/or otherwise conveyed in the Plan or by Court order, the Debtors reserve any and all of Causes of Action, whether arising before or after the date the Chapter 11 Cases were filed.  Such Causes of Action include, without limitation (a) all Avoidance Actions and other potential Avoidance Actions, and (b) any and all Claims or Causes of Action that the Debtors may have or have a right to assert against CD Homes, LLC, Robert Parker, Anna Williams, and 1040 Hyde Park, LLC.

**C.     Remnant Asset Auctions.**

1.     At the Confirmation Hearing or such later time as determined by the Debtors (the "Shadywood and Looscan DIP Claim Determination Date"), the Debtors shall seek a determination from the Bankruptcy Court of the Allowed amount of the Shadywood DIP Claim and the Looscan DIP Claim.  The amount of the Shadywood DIP Claim and the Looscan DIP Claim will be the initial

bids for the Shadywood Remnant Assets and the Looscan Remnant Assets, respectively.

2.      Within 7 days after the Shadywood and Looscan DIP Claim Determination Date, the Debtors shall file a Notice of Auction of Remnant Assets in the form attached hereto as Exhibit 2 (the "Notice of Auction") in order to notify potential bidders and parties-in-interest of the Auction for the Shadywood Remnant Assets and the Looscan Remnant Assets. The Notice of Auction includes the bidding procedures (the "Bidding Procedures") that will govern the sale of the Shadywood Remnant Assets and the Looscan Remnant Assets.

3.      Within 21 days of the entry of the Shadywood and Looscan DIP Claim Determination Date, any party desiring to bid on the Shadywood Remnant Assets or the Looscan Remnant Assets must provide counsel to the Debtors a certified check in the amount of the Shadywood DIP Claim or the Looscan DIP Claim, respectively.

4.      If there are any bidders for the Shadywood Remnant Assets or the Looscan Remnant Assets of than the DIP Lender, there will be an Auction for the Shadywood Remnant Assets or the Looscan Remnant Assets, as applicable, as set forth in the Notice of Auction. Any prospective bidder must bring good available funds to the Auction for any amount such bidder bids (without including any amount already provided to the Debtors' counsel).

5.      Each Auction described in the preceding paragraph shall be governed by the Bidding Procedures.

6.      If there are no bidders for the Shadywood Remnant Assets or the Looscan Remnant Assets other than the DIP Lender, then the Debtors shall file a notice of on the docket indicating that there is no auction and the Shadywood Remnant Assets and/or the Looscan Remnant Assets shall be transferred to the DIP Lender.

7.      If there is an auction for the Shadywood Remnant Assets or the Looscan Remnant Assets, then the Debtors shall file a notice following such auction with the results of the auction. Any disputes regarding the auction shall be resolved by the Bankruptcy Court.

8.      All Shadywood Causes of Action and Looscan Causes of Action are included in the Shadywood Remnant Assets and the Looscan Remnant Assets, respectively.

9.      The Successful Bidder for the Shadywood Remnant Assets and the Looscan Remnant Assets, respectively, or their successors and assigns, shall be authorized and empowered as a representative of Shadywood and Looscan, respectively, to institute, prosecute, settle, compromise, abandon or release all Shadywood Causes of Action and Looscan Causes of Action, respectively.

10.      The Houtex Remnant Assets shall be assigned to the Houtex Liquidating Trust on the Effective Date.

**D.      Establishment of Houtex Liquidating Trust and Authority, Rights and Duties of Liquidating Trustee.**

1.      *Formation.* The Houtex Liquidating Trust Agreement shall be executed by Houtex and the Liquidating Trustee, and all other necessary steps shall be taken to establish the Houtex Liquidating Trust. The Houtex Liquidating Trust is intended to be classified for U.S. federal income tax purposes

as a "liquidating trust" within the meaning of Treasury Regulation § 301.7701-4(d) and all relevant parties shall treat the Houtex Liquidating Trust as a liquidating trust, subject to definitive guidance to the contrary from the U.S. Internal Revenue Service.

4.      *Purpose of Liquidating Trust.*  The Houtex Liquidating Trust shall be established for pursuing Houtex Causes of Action transferred to the Houtex Liquidating Trust, and otherwise liquidating and distributing the Houtex Remnant Assets, with no objective to continue or engage in the pursuit of a trade or business.

5.      *Causes of Action to be Transferred to the Houtex Liquidating Trust.*  All Houtex Causes of Action shall be Houtex Remnant Assets transferred to the Liquidating Trustee.  The Liquidating Trustee, or his successors and assigns, shall be authorized and empowered as a representative of Houtex and its Estate to institute, prosecute, settle, compromise, abandon or release all Houtex Causes of Action transferred to the Houtex Liquidating Trust.  Additionally, on the Effective Date, the Liquidating Trustee shall assume the prosecution of any motion, adversary proceeding, or other proceeding in the Bankruptcy Court currently being prosecuted by Houtex and shall be substituted for Houtex as the applicable party in interest, without the need to file any motion to substitute or other similar document.

6.      *Identity of Liquidating Trustee.*  The Liquidating Trustee shall be Charles Foster.

7.      *Authority of Liquidating Trustee.*  Subject only to the limitations contained in this Plan or in the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized and empowered to pursue and defend any Causes of Action as a representative of the Estate and shall have the powers of a trustee under §§ 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, including, without limitation, the right to: (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan; (ii) make Distributions to holders of Allowed Claims against Houtex in accordance with this Plan; (iii) object to Disputed Claims filed against Houtex and prosecute, settle or otherwise resolve such objections; (iv) establish and administer any reserves for Disputed Claims that may be required; (v) perform administrative services related to implementation of this Plan or the Liquidating Trust Agreement; (vi) file all necessary tax returns and other filings with governmental authorities on behalf of the Houtex Liquidating Trust; and (viii) perform such other duties as are provided in the Plan and the Liquidating Trust Agreement.

8.      *Oversight of Houtex Liquidating Trust.*  The Bankruptcy Court shall retain jurisdiction to consider and determine any dispute between holders of Liquidating Trust Beneficial Interests and the Liquidating Trustee.

## E.      **Claims Entitled to Distribution from the Houtex Liquidating Trust.**

1.      *Claims Generally.*  Except to the extent another provision of this Plan controls, the Liquidating Trustee shall be responsible for paying the following Claims against Houtex from the Houtex Remnant Assets (except to the extent already satisfied) in the following order of priority:

(i)      Allowed Non-DIP Administrative Claims and Professional Compensation Claims, in the order of priority provided in the Bankruptcy Code;

(ii)      Allowed Priority Claims;

(iii)    Allowed Secured Claims; and

(iv)    Allowed General Unsecured Claims.

Notwithstanding the foregoing, all expenses of the Houtex Liquidating Trust shall be taxed against the gross proceeds of the Houtex Liquidating Trust and shall be satisfied prior to any Distributions on account of Claims.

2.    *Procedure for Distributions from the Houtex Liquidating Trust.*  The Houtex Liquidating Trustee shall distribute Available Cash in accordance with the Liquidating Trust Agreement from the Houtex Remnant Assets in the Liquidating Trustee's possession (including any Cash received from Houtex on the Effective Date), except such amounts (i) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed, prior to the time of such Distribution (but only until such Claim is resolved), (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Houtex Remnant Assets during the administration of the Houtex Liquidating Trust, (iii) to pay reasonable expenses of the Liquidating Trust (including, but not limited to, any taxes imposed on the Houtex Liquidating Trust or in respect of the Houtex Remnant Assets), and (iv) to satisfy other liabilities incurred by the Houtex Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement (including without limitation any applicable reserves).

3.    *Compensation of the Liquidating Trustee.*  The Liquidating Trustee shall be entitled to reasonable compensation as set forth in the Liquidating Trust Agreement.

4.    *Retention of Professionals.*  As set forth in the Liquidating Trust Agreement, the Liquidating Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval.

5.    *Dissolution of Liquidating Trust.*  Once all Houtex Remnant Assets have been liquidated and all Distributions required to be made by the Liquidating Trustee under the Plan have been made, the Houtex Liquidating Trust shall be dissolved and the Liquidating Trustee shall be discharged. Notwithstanding the foregoing, in no event shall the term of the Houtex Liquidating Trust exceed five (5) years absent Bankruptcy Court approval.

6.    *Dissolution of Houtex.*  The Liquidating Trustee shall formally dissolve Houtex in accordance with applicable state law.

7.    *Indemnification of Liquidating Trustee.*  The Liquidating Trustee and the Liquidating Trustee's agents and professionals shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Liquidating Trustee, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Liquidating Trustee, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts. Any indemnification claim of the Liquidating Trustee, its agents or professionals, shall be satisfied from the Houtex Remnant Assets.  The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

**F.      Operations of the Debtors Between Confirmation Date and Effective Date**

The Debtors shall continue to operate as debtors-in-possession during the period from the Confirmation Date through the Effective Date.  Houtex shall use all reasonable efforts to liquidate the Lynbrook House during such period.  All Debtors shall file Objections to Proofs of Claim and obtain Final Orders resolving such Objections before the Effective Date.

Charles Foster is authorized to continue funding the costs for the maintenance of the Lynbrook House during such period as determined in the Debtor's reasonable business judgment. These amounts advanced will be added to the Houtex DIP Facility Claim amount and shall accrue interest at three percent per annum.  The Debtors shall seek a determination of the Allowed Amount of the DIP Facility Claim on, or prior to, the Effective Date.

If the Lynbrook House has not sold by January 31, 2019, Charles Foster has committed to satisfy all the outstanding real property taxes on the Lynbrook House.   For avoidance of doubt, any such advance shall be added to the Houtex DIP Facility Claim.

During the period from the Confirmation Date through the Effective Date, CommunityBank has the right to seek relief from the stay for "cause."

**G.      Establishment of the Administrative Claims Bar Date.**

1.      The Confirmation Order shall approve the Administrative Claims Bar Date.

2.      Except as otherwise provided in this Article IV, on or before the Administrative Claims Bar Date, each holder of a Non-DIP Administrative Claim shall file with the Bankruptcy Court a request for payment of its Administrative Claim.

3.      Notwithstanding anything in this Article IV, Professionals shall not be required to file a request for fees and expenses arising under §§ 328, 330, 331 or 503(b)(2)–(5) of the Bankruptcy Code, on or before the Administrative Claims Bar Date, as they will instead file final fee applications by the Professional Fee Claim Bar Date.

**H.      Term of Injunctions or Stays.**

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to §§ 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed.

**I.      Debtors' Professionals.**

Upon the Effective Date, the Debtors' Professionals shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case; *provided, however*, that the Debtors' Professionals shall be deemed retained after such date solely with respect to applications filed pursuant to §§ 330 and 331 of the Bankruptcy Code.  The Liquidating Trustee shall pay the reasonable fees, costs and expenses of such Professionals incurred after the Effective Date, if the Bankruptcy Court approves such fees, costs and expenses.

**J.      Closure of Looscan and Shadywood Cases.**

After (i) the Auctions of the Looscan Remnant Assets and the Shadywood Remnant Assets have concluded, (ii) Final Orders resolving any objections to Claim against Looscan and Shadywood have been issued; and (iii) holders of Allowed Claims against Looscan and Shadywood have been paid pursuant to this Plan, Looscan and Shadywood shall move the Bankruptcy Court for the issuance of final decrees closing the Looscan and Shadywood Chapter 11 Cases.

**ARTICLE V**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.      Initial Distributions from Remnant Asset Proceeds**

If any Debtor receives Remnant Asset Proceeds, each Debtor shall distribute such Remnant Asset Proceeds in accordance with the terms, treatment and priority provided in this Plan as soon as practicable after the closing of the sales of Remnant Assets; *provided; however*, that no Debtor shall distribute such amounts as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed, prior to the time of such Distribution (but only until such Claim is resolved).

**B.      Initial Distributions from Houtex Liquidating Trust**

The Liquidating Trustee shall distribute Available Cash in accordance with the terms, treatment and priority provided in this Plan and the Liquidating Trust Agreement from the Houtex Remnant Assets in the Liquidating Trustee's possession (including any Cash received from the Debtor on the Effective Date), except such amounts (i) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed, prior to the time of such Distribution (but only until such Claim is resolved), (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Houtex Remnant Assets during the administration of the Liquidating Trust, (iii) to pay reasonable expenses of the Liquidating Trust (including, but not limited to, any taxes imposed on the Liquidating Trust or in respect of the Houtex Remnant Assets), and (iv) to satisfy other liabilities incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement (including without limitation any applicable reserves.

**C.      Subsequent Distributions.**

Any Distribution that is not made on any date specified herein or in the Liquidating Trust Agreement because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be distributed as soon as practicable, and in accordance with the terms of this Plan and the Liquidating Trust Agreement, as applicable, after such Claim is Allowed by a Final Order of the Bankruptcy Court.

Distributions to all holders of Liquidating Trust Beneficial Interests shall be made in accordance with the terms of the Liquidating Trust Agreement.  On the Final Distribution Date, the Liquidating Trustee shall distribute the remaining assets of the Houtex Liquidating Trust to the Persons or Entities entitled to such assets.

**D.      Delivery of Distributions.**

1.      General Provisions; Undeliverable Distributions.

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made at (i) the address of each holder as set forth in the Schedule, unless superseded by the address set forth on proofs of Claim filed by such holder or (ii) the last known address of such holder if no proof of Claim is filed or if the Debtor or Liquidating Trustee has been notified in writing of a change of address.  If any Distribution is returned as undeliverable, the Debtor or Liquidating Trustee may, in its or his sole discretion, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made, but no Distribution to any holder shall be made unless and until the then-current address of the holder has been determined, at which time the Distribution to such holder shall be made to the holder without interest from and after the Effective Date through the date of Distribution.  Amounts in respect of any undeliverable Distributions shall be returned to, and held in trust by, the Debtor or Liquidating Trust until the Distributions are claimed or are deemed to be unclaimed property under § 347(b) of the Bankruptcy Code.  The Debtor and or the Liquidating Trustee shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; provided, however, that such discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Liquidating Trust Agreement.

        2.    Unclaimed Property.

Distributions that are not claimed by the expiration of one year from the Effective Date shall be deemed to be unclaimed property under § 347(b) of the Bankruptcy Code, and the Claims with respect to which those Distributions are made shall be automatically cancelled.  After the expiration of that one-year period, the right of any Entity to those Distributions shall be discharged and forever barred.  Nothing contained in the Plan shall require the Debtor or Liquidating Trustee to attempt to locate any holder of an Allowed Claim.

**E.      Manner of Cash Payments Under the Plan.**

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank or by wire transfer from a domestic bank, as applicable.

**F.      Time-Bar to Cash Payments by Check.**

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to this section shall be made by the holder of the Allowed Claim directly to the Person or Entity who originally issued the check, in writing, on or before the later of the first anniversary of the Effective Date or the first anniversary of the date on which the Claim at issue became an Allowed Claim.  After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall become unclaimed property in accordance with § 347(b) of the Bankruptcy Code.

**G.      Compliance with Tax Requirements.**

In connection with making Distributions under this Plan, to the extent applicable, the Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.  The Liquidating Trustee may withhold the entire

Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit.  Any property so withheld will then be paid by the Liquidating Trustee to the appropriate authority.  If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as an undeliverable Distribution in accordance with the terms of this Article V.

**H.     No Payments of Fractional Dollars and Minimum Distributions.**

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar.  The Liquidating Trustee shall not be obligated to make any Distribution of less than $10.

**I.     Interest on Claims.**

Interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid on any Claim, or portion thereof, that is a Disputed Claim in respect of the period from the Effective Date to the date such Disputed Claim, or portion thereof, becomes an Allowed Claim and Distributions are made on account thereof.  Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or other similar charges.

**J.     No Distribution in Excess of Allowed Amount of Claim.**

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

**K.     Setoff and Recoupment.**

The Debtors or the Liquidating Trustee may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any Debtor or Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release on behalf of the Debtors, their Estates, and, if applicable, the Houtex Liquidating Trust, as a successor-in-interest of any right of setoff or recoupment that any of them may have against the holder of any Claim.

**L.     No Distribution Pending Allowance.**

Notwithstanding any other provision of the Plan, the Debtors or the Liquidating Trustee shall not distribute any Cash or other property on account of any Claim that is Disputed unless and until such Claim or portion thereof becomes Allowed.

## ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.**

The Plan shall constitute a motion to reject all Executory Contracts and Unexpired Leases other than those Executory Contracts and Unexpired Leases designated for assumption either in this Plan or in the Executory Contract and Unexpired Lease Assumption and Assignment Schedule, which schedule shall be filed with the Plan Supplement if necessary.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all such rejections and assumptions and assignments pursuant to §§ 365(a) and 1123 of the Bankruptcy Code.

**B.      Claims Based on Rejection of Executory Contracts and Unexpired Leases.**

Claims resulting from the rejection of Executory Contracts and Unexpired Leases pursuant to Article VI.A, or the expiration or termination of any Executory Contract or Unexpired Lease after the entry of the Confirmation Order, but prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Liquidating Trustee no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to this paragraph for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, their Estates, the Liquidating Trust, their successors and assigns, and its assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article VIIID herein.  Unless otherwise ordered by the Bankruptcy Court or provided in this Plan, all such Claims that are timely filed as provided in the Plan shall be treated as General Unsecured Claims of the appropriate Debtor.

## ARTICLE VII
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

The following are conditions precedent to the occurrence of the Effective Date of the Plan:

1.      The Confirmation Order has been entered and become a Final Order.

2.      The Liquidating Trust Agreement has been executed and become effective, and all conditions to closing set forth therein shall have been satisfied.

3.      The Lynbrook House, Looscan Remnant Assets, and the Shadywood Remnant Assets shall have been sold.

4.      All Objections to Proofs of Claims shall have been adjudicated by a Final Order of the Bankruptcy Court.

The Debtors may waive the occurrence of, or modify, any of the foregoing conditions precedent to the Effective Date.  Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and

shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## ARTICLE VIII
## INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### A.     Compromise and Settlement.

Pursuant to § 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Member Interests.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Member Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtors, their Estates, and holders of Claims and Member Interests.

### B.     Releases.

1.     *Releases by the Debtor and the Estate.*  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, including, without limitation, the services of the Releasees in facilitating the expeditious implementation of the Plan, the Debtors hereby provide a full release to the Releasees (and each such Releasee so released shall be deemed released and discharged by the Debtors) from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence or circumstances, including actions in connection with indebtedness for money borrowed by the Debtors, existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that the Debtors would have been legally entitled to assert or that any holder of a Claim or Member Interest or other Person or Entity would have been legally entitled to assert for or on behalf of the Debtors or their Estates and further including those in any way related to the Estates, the Chapter 11 Cases or the Plan; *provided, however,* that the foregoing provisions of this Article VIII.B.1 not operate to waive or release the Releasees from any obligation under this Plan, the Liquidating Trust Agreement, or the Confirmation Order, as applicable.

2.     Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this Article VIII.B pursuant to Bankruptcy Rule 9019 and its finding that they are:  (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtor and all holders of Claims and Member Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Releasees asserting any Claim or Cause of Action thereby released.

## C.   Exculpation.

Notwithstanding anything contained in the Plan to the contrary, the Releasees shall neither have nor incur any liability to any Person or Entity for any Claims or Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or Disclosure Statement or any other post-petition act taken or omitted to be taken in connection with or in contemplation of the Plan; *provided, however*, that the foregoing provisions of this Article VIII.C shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided, further*, that each Releasee shall be entitled to rely upon the advice of counsel concerning its duties; *provided, further*, that the foregoing provisions of this Article VIII.C shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or any defenses thereto.

## D.   Injunction.

1.   Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Persons and Entities are permanently enjoined from commencing or continuing in any manner against the Debtors or their successors and assigns and its assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.

2.   Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, their Estates, the Houtex Liquidating Trust and Liquidating Trustee (if applicable), their successors and assigns and their assets and properties, any other Claims or Member Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

3.   The rights afforded in the Plan and the treatment of all Claims and Member Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Member Interests of any nature whatsoever, against the Debtors or any of their assets or properties.  On the Effective Date, all such Claims against, and Member Interests in, the Debtors shall be satisfied and released in full.

4.   Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Member Interest satisfied and released hereby, from:

(a)   commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, its successors and assigns, or its assets and properties;

(b)   enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, its successors and assigns, and its assets and properties;

(c)     creating, perfecting or enforcing any encumbrance of any kind against any Debtor, or the property or estate of the Debtor;

(d)     asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Debtor or against the property or estate of any Debtor, except to the extent a right to setoff, recoupment or subrogation is asserted with respect to a timely filed proof of claim; or

(e)     commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Member Interest or Cause of Action released or settled hereunder.

**E.     Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Debtors shall be fully released and discharged, and all of the Debtors' rights, title and interests in such property shall be distributed or transferred in accordance with this Plan.

**F.     Carve-Out**

Nothing in the Plan will release any Causes of Action retained by the Debtor and transferred to the Houtex Liquidating Trust.

# ARTICLE IX
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and with respect to all matters related to the Chapter 11 Cases, the Debtors, their Estates, all property of their Estates, and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Member Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance, secured status or priority of Claims or Member Interests;

2.      grant, deny or otherwise resolve any and all applications of Professionals for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.      resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which a Debtor was party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.      ensure that Distributions to holders of Allowed Claims and Member Interests are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date, *provided, however*, the right of the Liquidating Trustee to commence actions in all appropriate jurisdictions shall be fully reserved;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.      issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.      enforce the various provisions of the Plan and the Liquidating Trust Agreement;

10.     enforce the Injunction set forth herein;

11.     resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained herein, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

12.     enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.     resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.     enter an order or the decree contemplated in Bankruptcy Rule 3022 concluding the Chapter 11 Cases.

### ARTICLE X
### SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the Disclosure Statement Order [ECF No. [●]].

**The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.**

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND THE INSTRUCTIONS ACCOMPANYING THE BALLOT FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

**A.      Holders of Claims Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all holders of Claims against a debtor are entitled to vote on a chapter 11 plan.  The Debtors are soliciting votes to accept or reject the Plan only from holders of the following classes: Shadywood DIP Facility Claim, Looscan DIP Facility Claim, Spirit of Texas Bank, Great Southwest Financial Corporation, Houtex General Unsecured Claims, Shadywood General Unsecured Claims and Looscan General Unsecured Claims (collectively, the "Voting Classes").  The holders of claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of allowed Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are not soliciting votes from holders of any other class.  Additionally, the Disclosure Statement Order provides that certain holders of Claims in Houtex General Unsecured Claims Class, Shadywood General Unsecured Claims Class and Looscan General Unsecured Claims Class, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

**B.      Voting Record Date.**

**The Voting Record Date is [●], 2019.**  The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Clas are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

**C.      Submitting Votes on the Plan.**

**The Voting Deadline is [●], 2019, at [●].m. (prevailing Central Time).**  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by the Debtors' counsel on or before the Voting Deadline by one of the following methods:

| If by Email: | If by U.S. Mail or Delivery: |
|---|---|
| Send the completed ballot to the following email address: crubio@diamondmccarthy.com | Send the completed ballot form to the following address:<br><br>Diamond McCarthy LLP<br>Attention: Houtex Processing<br>909 Fannin, Suite 3700<br>Houston, Texas  77010 |

**D.** **Which Ballots Are Not Counted.**

**No ballot will be counted toward confirmation if, among other things:**

1.      it is illegible or contains insufficient information to permit the identification of the holder of the Claim;

2.      it was transmitted by a method other than as specifically set forth in the ballots;

3.      it was cast by a Person or Entity that is not entitled to vote on the Plan;

4.      it was cast for a Claim listed in the Debtors' Schedules as contingent, unliquidated, or disputed, for which the applicable Claims bar date has passed and no Proof of Claim was timely filed, or to which the Debtors or another party-in-interest with standing has objected, and such objection remains unresolved;

5.      it is unsigned; or

6.      it is not clearly marked to either accept or reject the Plan, or it is marked both to accept and reject the Plan.

**Please refer to the Disclosure Statement Order, and the instructions accompanying the ballot provided to you for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER, OR THE INSTRUCTIONS ACCOMPANYING THE BALLOT PROVIDED TO YOU WILL <u>NOT</u> BE COUNTED.**

## ARTICLE XI
## CONFIRMATION OF THE PLAN

**A.**      **Requirements for Confirmation of the Plan.**

Among the requirements for confirmation of the Plan pursuant to § 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of § 1129 of the Bankruptcy Code. The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors has complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

**B.**      **Best Interests of Creditors/Liquidation Analysis.**

Often called the "best interests" test,  § 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to

each impaired class, that each holder of a Claim in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the Debtors were liquidated under chapter 7.

The Debtors believe that confirmation of the Plan will provide an equivalent or better monetary return to holders of Claims as would a liquidation under chapter 7 of the Bankruptcy Code.

If the Debtor's cases were converted to cases under chapter 7 of the Bankruptcy Code, the Debtors' estimate that each of the Debtor's estate would incur additional administrative costs in the amount of approximately $10,000 to $25,000 for fees to the chapter 7 trustee and expenses for chapter 7 trustee's counsel, and potentially more under certain scenarios. Therefore, by avoiding these extra administrative costs, the Plan satisfies the best interest of the creditors test.

Attached hereto as Exhibit C is a Liquidation Analysis reflecting potential recovery scenarios for each of the Debtor's estates under the chapter 11 plan and under a hypothetical chapter 7.

## C.  Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor unless such liquidation or reorganization is proposed in such plan of reorganization.

The Plan satisfies Section 1129(a)(11) of the Bankruptcy Code by providing for an orderly liquidation of the Debtors.

## D.  Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of Claims impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[5] Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

## E.  Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to § 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's

---

[5]      A class of claims is "impaired" within the meaning of § 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim entitles the holder of such claim or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim entitles the holder of such claim.

rejection or deemed rejection of the plan, the plan will be confirmed, at the Debtors' request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of Claims that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of § 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.,* classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.,* secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to a dissenting class, the test sets different standards depending upon the type of claims in the class.

### (a)    Secured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

### (b)    Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or

junior interest any property.

(c)     Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of:  (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (ii) if the class does not receive the amount as required under (i) no class of interests junior to the non-accepting class may receive a distribution under the plan.

## ARTICLE XII
## TAX CONSEQUENCES OF THE PLAN

The following discussion generally sets forth the Federal income tax consequences to creditors upon confirmation and consummation of the Plan. No ruling has been sought or obtained by the Debtor from the Internal Revenue Service ("IRS") with respect to any of these matters. The following discussion of Federal income tax consequences is not binding on the IRS and is general in nature. No statement can be made herein with respect to the particular Federal income tax consequences to any creditor.

Creditors may be taxed on distributions they receive from the Estate. The amount of the income or gain, and its character as ordinary income or capital gain or loss, as the case may be, will depend upon the nature of the Claim of each particular creditor.

The method of accounting utilized by a creditor for Federal income tax purposes may also affect the tax consequences of a distribution. In general, the amount of gain (or loss) recognized by any such creditor distributes will be the difference between (i) the creditor's basis for Federal income tax purposes, if any, in the Claim and (ii) the amount of the distribution received.  Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a Claim or an item which would otherwise generate ordinary income on the one hand or in payment of a Claim which would constitute a return of capital.

ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## ARTICLE XIII
## CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides greater value to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. Further, the Debtors believe that payments will be made to creditors more quickly under this Plan than in Chapter 7.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims than that which is proposed under the Plan.

Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan by returning their Ballots so that they will be received by the Debtors no later than [●].m. (prevailing Central Time) on [●], 2019.

Dated: August 5, 2019
Houston, Texas

**HOUTEX BUILDERS, LLC**
**2203 LOOSCAN LANE, LLC**
**415 SHADYWOOD, LLC**

*/s/ Charles Foster*
Manager

**DIAMOND McCARTHY LLP**

*/s/ Charles M. Rubio*
Charles M. Rubio
TBA No. 24083768
Michael D. Fritz
TBA No. 24083029
909 Fannin, Suite 3700
Houston, TX 77010
(713) 333-5100
crubio@diamondmccarthy.com
mfritz@diamondmccarthy.com

*Counsel to Houtex Builders, LLC; 2203 Looscan Lane, LLC; and 415 Shadywood, LLC*